Candice Pullen, Plaintiff and appellate in this case, at all times relevant in the hearing. Candice Pullen was a 23, 24-year-old temporary clerk in the purchasing department where Timothy Graham was the director. Ms. Pullen brings suit for sexual harassment against her employer, Caddo Parish School Board, harassment that was done by the director, Timothy Graham. Mr. Graham entered into a systematic seduction of Ms. Pullen during this time period, drawing her into his office with promises of permanent employment, and that he also, while in the office, kept her there under the guise of discussing office business. He would discuss his sexual affairs, his infidelities, encourage her to engage in sex with him, show her nude pictures, partially nude women, talk about her body parts and things such as that. It was a routine, ongoing sexual harassment, hostile work environment. He also later spread false rumors about her sexual preferences, her sexual identity, and things such as that. Caused her a great deal of embarrassment and concern. She had to go get medical help with a skin disorder. The district court ruled in favor of the defendant on the affirmative defenses of Elrith Ferreger. That first part of that defense is an employer, has an employer exercise reasonable care to prevent and correct promptly all sexual harassing behavior. In this case, it's uncontested, undisputed, Ms. Pullen did not have any knowledge of the sexual harassment policy of the school board. Apparently a lot of people did not have knowledge of it, is that right? This is correct, your honor. There were other workers in the same area who had worked in the central office where these folks worked at. There were people who worked in classified personnel, folks that worked in purchasing, folks that worked in skill development and other areas, and worked there for a long time. Some as long as 30 years had worked there and did not know about the sexual harassment. Let's talk about her specifically. Sir. When she started working for the school board, was she a temporary worker or a full-time employee? She worked, I believe she worked full-time, but she was what they classify as a temporary employee. Someone that might work there for a couple days, someone that might work there a couple weeks, someone that might work there a few months, as Ms. Pullen did. She worked there from February to May in the purchasing department, then again in the personnel department in July, and then at another satellite location in transportation from September, October 2012 to March 2013. So she was coming in and out of the workforce of the school board? That's correct. Even before she worked at the central office, she had been a substitute teacher. She was a temporary worker, according to your understanding of the record. Did she receive any sort of training from the school board other than how to do the job to which she was assigned? In other words, did she have any instruction or orientation on the school board policies, school board code of conduct, or dress code, or anything? She had no orientation. I don't think we got into the detail you just went into about code of conduct or dress code, focused chiefly on the sexual harassment policy. No orientation of any sort? No orientation. So it was all on-the-job training? All on-the-job training. So her flat denial is, I never received a copy of the anti-discrimination or harassment policy of the school board? That is absolutely correct. And she never signed for a seat of one? That's correct, your honor. There's no contradictory evidence. She never heard anyone talk about such a policy? No. That I can't say. I don't think that's in the record. I don't know of anything in the record that shows that she heard anybody talk about harassment. She never went to anyone and said, I'm being harassed, what can I do? She went to an individual, Annette Dunlap, and told Annette Dunlap, I don't like him referring to she did not explicitly state I am being sexually harassed or anything. What did Annette Dunlap say in reply? That's Mr. Graham, you hang in there and you'll make it okay. So no comment by Ms. Dunlap to, well, you need to go report this to Graham's supervisor? Correct. Nothing, she did not refer. And what's interesting is Ms. Dunlap is one of the ones who has not been trained in the policy, and the policy explicitly states that if, in fact, you have knowledge of sexual harassment, you don't report it up to chain of command, you can be disciplined yourself. And she says she never saw the policy posted on, I think, the bulletin board. That is correct, and there's nothing contrary to that. I believe Cleveland White, who is the director of ClassDot personnel, indicated that temporary employees, the only way they get to know about the sexual harassment policy is you have to go look at the bulletin board. But yet, temporary employees were not even told that the policy is, if it's there, that it's on the bulletin board. They're not directed to the bulletin board. And so your client in a deposition or an affidavit said, no one ever told me to go look at the bulletin board to read the policy? That's correct. All right. That's correct. The issue seems to come down to this bulletin board. And the EEOC enforcement guidance says other measures to ensure effective dissemination of the policy and complaint procedure include posting them in central locations. Why isn't, under EEOC guidance, why isn't posting it in a bulletin board that my understanding is was right when you walked into this administration building, why isn't that sufficient? My understanding of the EEOC guidance is a little more in-depth than just— It goes on to say the employer should provide training. Right. I think it says the employer should establish, distribute to all employees, and enforce a policy prohibiting harassment setting on a procedure for making complaints. That's what I have. And I don't know where you're reading from, but this is what I have. Your briefing. I read my briefing. Page 28. But then it says other measures that ensure effective dissemination include posting them in central location and also incorporating them into employee handbooks. Well, here's one reason why we say bulletin boards just by themselves is not enough. In this case, Ms. Pullen believed the bulletin board, all it had on it were job postings. And at least one of the bulletin boards used here was encased in glass. The policy is an eight-page policy. And as far as we know, it was all put together behind glass. So one cannot flip the pages, one thing, to read the entire policy. That's one of the boards. And there are other boards. There's one by the cafeteria, I think, and one by the personnel department. But no one instructed at any time, Ms. Pullen, that important company policies are on that bulletin board. You need to go read them to learn about them. Were the policies in the three locations all behind glass or just the main bulletin board? Now, all I know is just one. All I know is one was encased in glass. The other two, I assume, were not encased. I believe the school board says it was accessible even with the glass. Do you dispute that? I don't dispute that. But I don't think an employee is going to feel comfortable opening up a bulletin board glass and start going through documents or posting on it unless they're in charge of that bulletin board. Well, that's commonly where, I mean, in most workplaces I've been in, bulletin boards are commonly where these legal notices are put. I mean, the most common probably being FLSA wage and hour stuff is always on those break room bulletin boards. I understand. What I can say is that every person is different. I understand you have your experience. Ms. Pullen is 23, 24 years old, fairly young. She may not have that same experience that you're on. But the issue isn't her personal. I mean, it's whether it was effectively disseminated to lead most, you know, to lead people of ordinary diligence to see the policy. Isn't that the test? Whether the school district reasonably disseminated it. Not whether she actually, at the end of the day, saw it. Yes. Well, what we say is, of course, the employer has an active obligation to exercise reasonable care. It's not a passive obligation where they can sit back and do very little and depend on the employee to explore and find things. I mean, it's more up to the employer to take an active role to where it can be reasonably assured that the employee has at least been exposed to the policy. Well, there was quite a bit of summary judgment evidence that that was done, wasn't it? Cleveland White testified that the board held sexual harassment training. Sherry Foreman testified that she received frequent sexual harassment training. Timothy Graham testified that he had received outside training that covered harassment in the workplace. That's a good point, Your Honor. Sherry Foreman did receive training before she got into the purchasing department. Once she landed foot in the purchasing department, she didn't get that training. And Timothy Graham, he received some outside training in harassment. I specifically asked him to receive any training in the school board sexual harassment policy. The answer was no. Have you ever received a copy of the policy, Mr. Supervisor, Mr. Director? No, he had not. So, and this is shown when you have an inconsistent training, inconsistent dissemination of the policy, you get inconsistent results. As in this situation, Mr. Graham, as testified by some of these same employees, liked to talk about sex in the open. He would talk about women's body parts, what he had between his legs and things such as that with some of these same folks that worked in the classified personnel section. Evidently, they didn't know that he could do this, and he did not know that the company at the school board had a policy against that. Now, he might have received some, you know, vague harassment training, but he did not receive any training in the policy. One more thing I'd like to bring up about the policy posted on the bulletin boards is that the policy that was posted in the central office did not name the individual to whom a harassment complaint should go to. The policy requires that the person in charge of the building either designate themselves or designate someone else as the person to receive the harassment complaint. And in this case, there's no evidence that any of the policies that were put on the bulletin board had that person's name on there. And the policies that the school board has produced in this case does not have a name on it as a person to whom to report. The policy also requires training of all employees. Of course, the obligation of the employer to take reasonable care is an obligation to all employees. It's not just to the permanent full-time employees, but it's to any employee employed by the school board. Title VII says an employee is very broad as a person employed by an employer. You agree that if at times, Graham, we would hold as the district court did, that at times, Graham was not your client's supervisor, then there would not be strict liability, a possibility of strict liability, and we have to determine whether the school board knew of this harassment. Or was negligent in not knowing. Right. I would think either he is a supervisor because the harassment he did after the first period of time. I'm not asking about that. I just want to make sure we're on the same ground about the distinction used by the district judge between when he was the supervisor formally and when he was not the supervisor formally. I know you're claiming that this supervisory relationship extended the entire time she worked there because he would track her from place to place, but assuming he was not her supervisor, then strict liability would not apply under the Farragut and Eller test. That's absolutely. We agree on that. Yes, sir. Yes, sir. I understand what you're saying. Either he was a supervisor or it has to be the co-worker standards would have to apply, and I think still those those negligent standards apply here for the very same reasons why the policy was never disseminated appropriately. No training, things of that nature, so that she didn't have the training and knowledge to make that report. I'll reserve my time. Yes, you saved time for rebuttal, Mr. Cameron. Thank you, Mr. Kearney. If it may please the court, there are two legal issues that I'd like to address in the 20 minutes that I have before the panel. The first legal issue is, can an employer such as the Cattle Parish School Board, someone, an employer who has implemented a detailed sexual harassment policy, who has conspicuously posted that policy throughout the workplace that this particular plaintiff worked and who has given educational programs to a vast majority of its close to 6,000 employees in the system, can that employer avail itself of the Ella Farragher affirmative defense? I don't quite see how something posted inside a glass case where only the first page is showing is effective. What is the employee supposed to do in that situation? There is only one, the record evidence shows there's only one of the three specific bulletin boards that are in the record that had a sliding glass that you could just put your fingers in and slide open. That particular policy on the front cover specifically said sexual harassment, indicated that it was a multi-page document. You could actually see the staple on that. Even if that employee did not notice that that glass case could be slid open, certainly by just seeing that inside that glass door, if she felt she was truly being sexually harassed, a nominal burden would have been to go to the HR department and ask to see a copy of that policy. Whom would the person contact, a person who felt harassed or who felt someone else was being harassed, flip through that policy, would they find a name, a room number, a phone number, what would they see? In that particular policy that was posted, since we're not talking about a school site,  the policy itself just said, you know, the highest level person in that would be an appropriate person to go to. I think it's important to know... I'd say that again more specifically. The highest level person in what? At that site. I don't mean that you have to quote it exactly because it's not in front of you, but what direction did it give to someone feeling harassed about where do you go or whom do you talk to? It would say the highest person at that site in this particular site was the central office. The superintendent's office was at that location. The assistant superintendent who was actually in charge. But it didn't say that, it just said the highest person, right? Yes, that's correct. And obviously Ms. Pullen actually worked in the HR department. The director of classified personnel who would have been her boss when she worked in the HR department was obviously an appropriate person. I think it's also important to keep in mind that the Cattle Pair School Board's policy said those aren't the only people and this mechanism isn't the only mechanism you need in order to report. That there were other mechanisms in place including its grievance policy. So this is not a policy that said you had to report to one specific individual and we're certainly not taking the position in this case that if you didn't complain to that specific individual, you were not reasonable. There were multiple people that could have received complaints. The school board trained the supervisors and principals what they're supposed to do when they receive a complaint. They actually developed forms that they gave including the forms that they gave to Mr. Woolfolk who was the chief operations officer and who was the person that was assigned to investigate the Amy Harris complaint when that was first brought to the attention. What is in the record as to why the school board did not give some sort of orientation or training to the plaintiff when she began working as a temporary worker? This is, I don't think there's anything in the record. No one on either side asked. Sort of just lie behind the log. We are talking about actually a small subset of employees. They are the substitute temporary clericals who worked at the central office building. The undisputed record evidence is clear that if you worked at a school site regardless of whether you were a substitute employee or not, you received training because. That doesn't help you. That actually makes your position worse. So what is in the record as to why these, the small cadre you call them that worked in the administration building or wherever they were, were not given some sort of orientation on sexual harassment and other workplace problems? There is nothing in the record that actually goes to why. Oh, you could not, you didn't provide any record evidence and the other side didn't ask. This is a point that we've never taken the position that Ms. Pullen and the other substitute employees at the central office location did receive training specifically on that policy. I understand. My question was why? Well, that's not in the record. I think if you were to ask me. I asked you, did anyone ask why? And you're telling me no, no one. You didn't, you didn't give them a reason and the other side just didn't ask. That was not a question that was addressed. However, we have to remember that these are substitute employees. They are not long-term employees that are, if you look at Ms. Pullen's. Your argument then makes it say, well, they're just ripe for sexual harassment. I don't think you want to make that argument. No, but I don't think that the law requires an employer to have to train every single employee on its policy. There are many employers, including in the cases that we've seen from the circuit, where the employer will only train the supervisory level employees. Unless we're going. How hard is it to give even a temporary employee a copy of that workplace policy about sexual harassment? How difficult is that? Well, I mean, the policy manual is 888 pages. I guess they could give some sort of acknowledgement form that says, hey, you've been advised that you've gotten a copy of this policy and that you've read or understood it. The employee would sign that I did receive it. And that certainly would be something. And if this case were to come back before this panel and we were looking at another substitute clerical in the same circumstances, and the school board did not do anything between now and then to maybe change their policies, maybe we have a different question than maybe the school board's actions, whether they would meet the first prong of the Ella Farragut case in that case would be a different question. We're here on cross motions for summary judgment. Why isn't the answer to this case, at least on the Farragut test, that there's a genuine dispute of material fact? A genuine dispute of material fact? Yes, or as to whether you can apply the affirmative defense that the person didn't take the steps the person should have taken to prevent this harassment. Because I think, yes, they were not personally handed the copy of the policy. They were not told, hey, we have the policy posted on the bulletin board. But certainly the school board did many other things that I think in this case, if you were to look at a spectrum of zero being completely unreasonable, 100 being reasonable, I think the school board is above 90 in terms of all the other steps that they took, considering that they have close to 6,000 employees. But going to Judge Barksdale's question, though, about whether there are genuine factual issues here, there is evidence in the summary judgment record such as Joyce Clemon, who spent about 30 years at the central office, said that she had never been given any information or training about sexual harassment. Whether or not you agree that that's true, the question is, does evidence like that, and there's some more from Mary Russell and some others, indicate that there is at least a dispute about those facts? I don't, there's not a dispute about the fact as to whether they were given training. You know, we acknowledge, and we've never taken the position, that no, these substitute clericals at central office did not get training. They were not specifically told. Well, but Joyce Clemons wasn't a temporary. She was there for 30 years. We're talking, there's also a couple people who Mr. Cameron deposed who were clericals, non-temporary clericals at the central office who also claimed that they did not get training. The question really is, do we require 100% perfection before an employer can avail itself of the elepharic of defense? But as Judge Barksdale just said, the question here isn't, can you avail yourself of the defense? It's, are you entitled to judgment as a matter of law on the defense? If we were to reverse, you'd be able to argue it in front of the jury. You'd likely be able to get a jury instruction on this defense. That's common in these cases. And I know that's the way you reframe the issue. It's not, if the case is reversed, you're not being deprived of the defense. So, and it's an affirmative defense on which you have the burden of proof, which is a much more difficult situation on which to get summary judgment than the typical case where a defendant is just trying to say the plaintiffs produced no evidence. And I'll go over the facts in a minute, but I want to address the question. I don't believe that a reasonable juror with all the facts, and I'll go through the factors in a minute, can find that the school board was not reasonable. And that's why I believe that summary judgment was proper. Let's look at the facts other than the ones that we've talked about. And really, I think a good way of doing it is comparing to the Bro Brothers case, which found it was an en banc decision by this court that said, when you look at all the factors as to what the Bro Brothers company did in that case, that was not reasonable, and they could not avail themselves of the affirmative defense. In the Bro Brothers case, they had a very generic EEO statement. Just lay the facts out for us. Okay. The Cattle Parish School Board facts, they had the eight-page policy, very detailed. It's probably one of the most detailed policies I've ever seen in the 20 years that I've been practicing management side labor and employment law. They had this policy posted throughout the central office location, which the EEOC has recognized in its own guidance is considered to be an effective means of dissemination. I didn't see anything in the record that would show, like, photographs of what these bulletin boards look like, or even a floor plan that would show where they were. Is there anything you can point us to? In the record is the Dr. Mary Nash Robinson affidavit. There's no actual photos for us to actually see. I mean, it's much better to have the photos than to have someone describing it. There is not a photo in the particular record. The policy was posted throughout the central office building, including by the cafeteria, where all the central office employees includes... When you say throughout, you're talking about three places. There were three specific places that were identified in the record, yes. It was also on the website, which is the very website that Ms. Pullen accessed when she was applying for various open vacancies, and she did that frequently. Again, this goes to my question about photos of the bulletin board. How was it on the website? Was it on the homepage where you'd automatically see it? Did you have to click on something? I just didn't see any detail that would really... It would not have been on the home... My understanding is it would not have been on the homepage. You would have had to do a word search for it, and then it would have come up. And again, that would have been the same for all the other various policies in the 888 page manual that the school board had. They also had paper copies of this policy available in various departments, which had she just gone and asked for a copy, she certainly would have been given a copy. The cattle pair school board policy provided very detailed instructions and gave examples of what is prohibited harassment, what is not, what you can do if you feel like you've been... If you feel like you've been a victim of harassment. They had two dedicated HR departments, one for the classified personnel, and that was Cleveland White's office. Again, those... Both HR departments were there in the same building that Ms. Pullen worked at. The school board, in addition to the policy, had created forms to give to people who were the complaint receivers. They did that when Amy Harris, who is a substitute clerical, just like Candace Pullen, who only worked for Mr. Graham for one week, and then she went to Annette Dunlap and said, I don't like working for Tim Graham because Tim Graham is saying this, this, and this. And that prompted Annette Dunlap, who happens to be the mother of Candace Pullen's... Not the mother, the grandmother of Candace Pullen's baby son, who had just been born a few months before that, prompt her to go to her boss, Cleveland White, who is the personnel director for the classified personnel. And that's what started this investigation. And that's how the school board learned that not only had Tim Graham apparently been saying some of these things to Ms. Harris, but he had been saying it to several others too. And they promptly investigated that and they took corrective action. The moment she worked there before this happened, before she went to this family friend, whoever it was. There were two periods of time that she worked in purchasing department under Mr. Graham. One was from February to June of 2011. And then she stopped working, did not work anywhere else in the school board system. And then she had her baby. Ms. Dunlap's son was the father of this child. Ms. Dunlap asked, do you want to come back and work in the purchasing department? Mr. Graham needs somebody before he's able to hire a permanent, somebody for the permanent slot of the buyer assistant position. So she came back approximately six weeks after the birth of her baby, which would have been in February of 2012, and then worked in that department until the end of May of 2012. At which point, that's when Mr. Graham had hired a permanent employee to be this buyer assistant. He no longer had a need for a temporary clerical in his department. And then Ms. Candace Pullins started working in Cleveland White's director of classified personnel for about 30 days. And then she stopped working until about September of October. And then she was reassigned to work at an outside location. My question was, when the events you've told us about where she went and said, I don't like the way he's talking. How long did she work there before that happened? It would have been, she claimed the harassment was during the February to June 2011 period and the February to May 2012. I'm sorry, I'm not being very clear. You've told us about her finally going and complaining to someone. Okay. When did that happen? That happened and she did not complain. Amy Harris had complained in 2013. Okay. So Ms. Pullin never complained. Ms. Pullin never complained. Right. The only reason we found out about Ms. Pullin is because Amy Harris in her complaint to the school board said she thinks that there have been a couple other people. And she identified Ms. Pullin and two other people as people who she believed had also experienced this. And that's who the school board, and that's how we found out about her allegations. In addition, going back to the question about, you know, is there a fact issue or not in this case? Not a fact issue, a genuine dispute of material, material fact. The school board provided annual training to all of its supervisor employees, including they gave training to Mr. Graham. And I heard Mr. Cameron say a few minutes ago that it wasn't specifically on the policy, but Mr. Graham was very clear in his deposition testimony that he was required to attend these Franklin Covey sessions that included several one-hour sessions on harassment in the workplace. So again, this is not an employer that just has a policy or a generic policy and doesn't take many steps to implement that policy. Yes, they are not 100% perfect. And obviously, this case has indicated that there is a gap in terms of the training or maybe some other things that the school board can do. But the question is, and for summary judgment purposes, in order to get summary judgment on the Ella Farragut offense, do they have to show 100% perfection? Do they have to show that this particular plaintiff, even though she really made no effort to find out if they had a policy, she just turned a blind eye, do we have to go out and affirmatively tell that person, hey, we have a policy or, hey, this policy is on the bulletin board. You need to go look at it. I think Title VII and I think the Supreme Court in this court have made clear that one of the purposes of the Ella Farragut offense is not just to put all the burden on the employer. Obviously, it is meant to encourage the employer to take steps to prevent harassment. And if harassment takes place to promptly correct that, there is also a burden under the doctrine of avoidable consequences that requires some effort. We're not saying a lot of effort on behalf of the plaintiff before we can say that they're not entitled to that defense. In this case, when you look at all the things that the Cattle Parish School Board did in this case, yes, it was not 100%. It wasn't best practices. They did not make sure that every single employee got training. But when you look at that, for summary judgment purposes, could a reasonable juror have found that they were not reasonable or that they did not implement or take steps to implement a suitable program and to take reasonable measures to prevent discriminatory conduct? And we don't believe that any reasonable juror like Judge Foote found when you look at all those facts and based on the case law we have for us, could say that a reasonable juror could say that no, the Cattle Parish School Board did not. The million-dollar question in this case, what could a temporary employee, a substitute employee like Ms. Pullen do? All she had to do, even if we didn't tell her we had a policy, but we certainly had it posted, she could have asked anyone in management, hey, does the Cattle Parish School Board have a sexual harassment policy? She could have gone, when she was going to the bulletin boards for the job announcement postings, this is all it would have taken to see if they had a sexual harassment policy. That's not a lot of effort. She could have gone to her mother-in-law or her grandmother, the mother of her son, to ask, do we have a policy? Her dad worked in the security department. She made a conscious choice not to tell him because she said she was afraid her dad was going to kill Mr. Graham. That's a conscious choice. It's not because she wasn't aware of the policy, that she had multiple avenues to be able to- Here again, you're on summary judgment. These are great, maybe great questions for a jury. You could make that argument to a jury, but I don't think it has a whole lot of weight here on trying to uphold a summary judgment. I just think when you look at all the evidence- Did you ask her in her deposition, why didn't you go tell your father? Yes. And she said, because he said I was afraid he'd kill him. She said, my dad, I didn't want my daddy to kill him. I specifically asked her in her deposition, why didn't you tell anyone about what he was doing? Because she did not even tell Ms. Annette Dunlap the specifics. All she said was, I'm not, I don't like working for Mr. Graham. And she said, I did not want to cause any drama. So she, it wasn't because she was unaware of the policy. It's because she made a conscious choice- She denied being unaware of the policy, didn't she? She claimed- Yeah, she claims- In the deposition, she said I was not aware of the policy. There's no dispute about that. There you go. That's maybe why there's a genuine dispute of material facts. But she still, she didn't make any other effort to find out if there was a policy. And I think when you look at all the facts, and I notice my time is out, I just don't believe that a rational, reasonable juror could find that the school board could not meet prongs one and two of that defense. Thank you. Thank you, Mr. Carney. Mr. Cameron, you've saved time for rebuttal. A short rebuttal, your honors. There isn't any controverting evidence that Ms. Pullen was not aware of the policy. There's no signed receipt. There is no orientation. There's no login sheet for a training session. And in fact, Cleveland White testified the policy of the school board. The policy of the school board is we don't train temporary employees. That's the policy. The policy is they go to the bulletin board if they can find it and they can see a policy up there. And that's how they get to find out about it. That's the policy. That's the policy. I mean, and that's all consistent with the evidence. I think what we have to, we look at a little bit here and I don't really make light of anything, you can take a horse to water, but you can't make them drink. The employer has to be able to take the employee to the water. And if they partake of the water, that's up to the employee. But the employer has to take the employee there first. Now, this policy is eight pages long. It may be the most thorough that counsel has seen, but it's eight pages long for a reason. One, it applies to students. It applies to teachers. It applies to employees. It applies to multiple locations. It's a long policy. It may be something that someone doesn't read all the way through. I think the, who you report to is in section five, subpart B. It says the person in charge of each site is responsible for receiving oral or written reports. The person in charge of each site, who is that person? I think the defendants want to say, well, that's the superintendent. Well, the superintendent is in charge of all sites, not in charge of any one particular site. So who is this person that's in charge of the site? So it's a little bit confusing. And the policy is to be conspicuously uh posted and it must have, according to the policy, the school board, it must have the person's designated to receive complaints, including a mailing address and a telephone number. You would agree, I hope, that conspicuous posting is satisfied at least if it was prominently displayed right next to where you enter the cafeteria. That sounds to me like a pretty reasonable way of alerting people conspicuously. It is. If you know that that is something that where important company policies were posted and that is something that, uh, you know, where a sexual harassment policy is supposed to be at. Well, if the company puts it right beside where you go into the cafeteria, it seems to me that any reasonable person would conclude from that that the company wants you to see it. I'm just, I'm just talking about that narrow fact. That doesn't decide your whole case, but I understand what you're saying. And that is a point I've thought about. Does it actually give the person an opportunity to review the policy? Is something along the line of in a employment case, if you have a failure to promote case and the person doesn't know about the promotion, do they really have an opportunity to apply for it? And I think there's some case law out there that says, no, the person doesn't. As long as the company knows they're interested in it, then he doesn't have to apply for that promotion. Miss Pullen was not told that on the policy, on the bulletin board, there are important company policies. What she knew was that this is a place where I can look at for jobs. Well, when I get a job, I've seen job postings up there, but otherwise she doesn't know what else might be up there. It might be somebody selling a barbecue pit or it could be almost anything up there. In the, in the, again, I want to know what's in the summary judgment record. She categorically denies having seen the sexual harassment policy posted on any of those three bulletin boards. I don't know if this is explicit as that. It is. I am not aware of the policy. I haven't seen the policy. So from that, we infer that she hasn't seen it on the bulletin board because she's never seen it before. So the other side didn't ask her in her deposition. Now, what about the policy that was posted on the slide behind the sliding glass door? Did you see it? Did they go down one, two, three for each of the three sites? I remember something along that line, Your Honor, but I can't, I don't have a real clear memory of that. I don't know if they went bulletin board. I know that they talked about the bulletin boards and asked if she'd been, and I believe it was asked about that. All right, your time is up. Thank you. Your case is under submission, Mr. Cameron. Thank you.